**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| TOOLCHEX, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> PATRICK J. TRAINOR, ) <br> ) <br> Defendant. ) <br> ) | Civil No. 3:08-cv-00236-JRS <br><br> Chief Judge James R. Spencer |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF
TOOLCHEX, INC.'S MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff Toolchex, Inc. ("Toolchex") respectfully submits this Memorandum of Law in support of its motion for an order, under Federal Rule of Civil Procedure 65, that will preliminarily enjoin Defendant Patrick J. Trainor from using Plaintiff's trademarks, or trademarks confusingly similar to Plaintiff's trademarks, in violation of federal and state trademark counterfeiting, trademark infringement, and unfair competition laws.

**I.     PRELIMINARY STATEMENT**

Since its founding in 2002, Plaintiff Toolchex has become a prominent third-party administrator of tool reimbursement plans, an employee benefit whereby employers reimburse their employees on a pre-tax basis for the cost of tools the employees purchase and use in connection with their employment. Toolchex serves over 900 employers and 15,000 employees in 49 states, including Virginia, and is the owner of the federally registered TOOLCHEX trademarks for use in connection with the administration of employee benefit plans.

Defendant Trainor is a former Toolchex sales representative who, by virtue of his former association with Toolchex, has specific knowledge of the value and goodwill of the Toolchex

name and the TOOLCHEX Marks. Trainor is now unlawfully using this knowledge by devising and operating an illegal scam to exploit for his personal benefit Toolchex's name, trademarks, and business opportunities.

First, Trainor has brazenly approached consumers in this judicial district, representing himself as a Toolchex employee and used the Toolchex name to sell and operate bogus tool reimbursement plan services that are not approved by Toolchex. Second, Trainor has created and distributed to consumers counterfeit "Toolchex" documents that display the TOOLCHEX Marks, which Trainor is using to further trade upon Toolchex's goodwill and to further the fiction that he represents Toolchex. As a result of these unlawful activities, Trainor has succeeded in deceiving consumers in this judicial district into believing that the fake "services" he is selling are those of Toolchex.

Trainor's deception is an immediate and continuing threat to the goodwill and reputation of TOOLCHEX as embodied in the Marks. The deception causes irreparable injury to Toolchex's goodwill and customer relationships. To protect one of its most valuable assets—namely the goodwill associated with the TOOLCHEX Marks—Toolchex seeks preliminary injunctive relief and brings claims against Trainor for, among other things, trademark counterfeiting, trademark infringement, and unfair competition. The essence of these claims is that Trainor is falsely passing himself off as Toolchex by using Toolchex's name, the TOOLCHEX Marks, and counterfeit Toolchex documents, all without Toolchex's consent. Because of these unlawful acts, Toolchex seeks to enjoin Trainor from the use of the Toolchex name, the TOOLCHEX Marks, or any names confusingly similar to the Marks.

Preliminary injunctive relief is necessary in this case because Toolchex has no other adequate remedy at law to protect its rights. If Trainor is permitted to continue to engage in this

course of conduct, the irreparable harm suffered by Toolchex will continue unabated, tarnishing Toolchex's goodwill and reputation for providing high-quality services, and causing further injury to Toolchex

## II.     FACTS

The facts are set forth in detail in the accompanying declarations of Gary E. Leavitt ("Leavitt Decl."), and Barry Moore ("Moore Decl."). The facts are summarized briefly below.

### A.     Plaintiff's TOOLCHEX Trademarks.

Toolchex is a third party administrator of Tool Reimbursement Plans. Leavitt Decl. ¶ 3. Tool Reimbursement Plans are an employee benefit whereby employers reimburse their employees on a pre-tax basis for the cost of tools and business-related expenses that employees purchase or incur in connection with their employment. *Id.* Toolchex's Tool Reimbursement Plans are designed to comply with the Accountable Plan Rules that are set forth in the Internal Revenue Code and Treasury Regulations. Leavitt Decl. ¶ 4. Toolchex, on behalf of employer-participants in Toolchex's program, substantiates the claimed expenses, verifies that the claimed expenses are connected with the employer's business, and reimburses the employees. *Id.* Key aspects of Toolchex's Tool Reimbursement Plan are based on confidential proprietary and trade secret information. *Id*.

The main elements of the Toolchex reimbursement process are as follows: (1) Toolchex calculates and substantiates the amount of each employee's reimbursement per pay period; (2) Toolchex's Accounting Department forwards to the employer an invoice for the total amount of reimbursements to be paid each pay period; (3) Toolchex forwards to the employer separate

reimbursement checks, drawn on Toolchex's account as payor, payable to each employee; and (4) the employer distributes Toolchex's checks to its employees.[1] Leavitt Decl. ¶ 5.

As part of its business, Toolchex owns federal trademark registrations for TOOLCHEX and TOOLCHEX Plus Design (the "TOOLCHEX Marks"). Leavitt Decl. ¶ 7. Specifically, Toolchex owns all right, title, and interest in and to the wordmark TOOLCHEX, which Toolchex registered with the United States Patent and Trademark Office ("PTO") on July 29, 2003 (Registration No. 2,742,122), and to the servicemark TOOLCHEX Plus Design with "Gavels; Hammers; Mallets (tools)" and "circles as carriers or as a single border," which Toolchex registered with the PTO on April 6, 2004 (Registration No. 2,829,886), both related to the "Administration of employee benefit plans." Leavitt Decl. ¶¶ 8-9 & Exs. A-B. In addition to its federal trademark registrations, Toolchex also enjoys other substantial legal rights in the TOOLCHEX Marks stemming from Toolchex's substantial use of the TOOLCHEX Marks in connection with the interstate advertising, marketing for sale, and sale of Toolchex's services over the years.[2] Leavitt Decl. ¶ 10. At least as early as May 2002, Toolchex began formally using the TOOLCHEX Marks in connection with the advertising, marketing, and sale of Toolchex's services, and has used the Marks continuously since that time. Leavitt Decl. ¶ 12.

The strength of the TOOLCHEX Marks and the goodwill associated with them is evidenced by the strong growth in the number of employers and employees who have participated in TOOLCHEX Tool Reimbursement Plans since Toolchex began in 2002. Leavitt

---

[1] In some cases, Toolchex is authorized to work with the employer's payroll provider and, through procedures developed with the consent of all concerned, make direct deposits into each employee's bank account. Leavitt Decl. ¶ 5.

[2] For example, Toolchex also owns the Internet domain name www.toolchex.com, which Toolchex uses as a tool for the marketing and sale of services related to the administration of Tool Reimbursement Plans. Leavitt Decl. ¶ 11.

4

Decl. ¶ 13.  Approximately 900 employers and 15,000 employees in 49 states (including employers and employees located in the Eastern District of Virginia) have participated in Toolchex's Tool Reimbursement Plans.  Leavitt Decl. ¶ 6.

Due to the value of its Marks, Toolchex carefully guards the use of its protected TOOLCHEX Marks.  Leavitt Decl. ¶ 14.  Toolchex does not permit its employees or representatives to use the TOOLCHEX Marks without express permission.  Leavitt Decl. ¶ 15.  Nor does Toolchex permit its employees or representatives to create or distribute any forms, advertising, documents, or other media using the TOOLCHEX Marks without express permission from Toolchex.  Leavitt Decl. ¶ 16.

    **B.**    **Trainor's Infringement of the TOOLCHEX Marks.**

        *1.*    *Trainor was Briefly Associated with Toolchex as an Independent Contractor Working for National Sales Pros.*

On June 14, 2006, Toolchex entered into an "Affiliation Agreement" with Charles Thompson, d/b/a National Sales Pros, Inc. ("National Sales Pros"), whereby National Sales Pros agreed to "build and grow a national sales organization" to market TOOLCHEX Tool Reimbursement Plans.  Leavitt Decl. ¶ 17.  In November 2006, Trainor began marketing TOOLCHEX Tool Reimbursement Plans as an independent contractor to National Sales Pros. Leavitt Decl. ¶ 18.  As an independent contractor working for National Sales Pros, Trainor had wide access to the names of Toolchex's clients and potential clients in, among other places, the Commonwealth of Virginia, and to information and documents relating to the TOOLCHEX Tool Reimbursement Plan and the TOOLCHEX Marks.  Leavitt Decl. ¶ 19.

As an independent contractor working for National Sales Pros, Trainor's responsibilities included: (a) identifying prospective clients for Toolchex (i.e., employers that required employees to furnish their own tools and equipment as a condition of employment);

(b) explaining the operation of Toolchex's Tool Reimbursement Plan to potential Toolchex clients; (c) inputting the names of potential Toolchex clients into Toolchex's client-management database; (d) assisting Toolchex clients with executing employee enrollment documents that Toolchex provided to Trainor; (e) meeting with Toolchex's clients' employees and explaining the operations of the TOOLCHEX Tool Reimbursement Plan; (f) assisting Toolchex's clients' employees with executing employee enrollment forms that Toolchex provided to Trainor; (g) photographing employees' tools and equipment, and (h) compiling and forwarding enrollment documents to Toolchex's Enrollment and Compliance Departments in Utah. Leavitt Decl. ¶ 20.

At no time, however, did Toolchex authorize Trainor: (a) to execute employer or employee enrollment documents; (b) to enter into contractual arrangements binding Toolchex; (c) to make a final determination regarding the substantiation of employee expenses; (d) to retain photographs of employees' tools; (e) to prepare, issue, or deliver invoices; (f) to accept, handle, or retain money or checks payable to Toolchex; (g) to issue checks on behalf of Toolchex; (h) to operate a TOOLCHEX Tool Reimbursement Plan; or (i) to utilize the TOOLCHEX Marks, except in connection with his role as an independent contractor for National Sales Pros. Leavitt Decl. ¶ 21.

Rather, as Toolchex instructed, when a client executed enrollment forms to join the TOOLCHEX Tool Reimbursement Plan, Trainor was to forward the documents to Toolchex's corporate headquarters in Utah. Leavitt Decl. ¶ 22. Toolchex's management would then execute the enrollment documents on behalf of Toolchex and forward executed copies directly to the client. *Id.*

### 2. *Trainor Approached Haley Pontiac GMC.*

In the summer of 2007, Trainor made a sales presentation for the TOOLCHEX Tool Reimbursement Plan to Barry Moore ("Moore"), the General Manager of Haley Pontiac-GMC ("Haley Pontiac"), an automotive dealership located in Richmond, Virginia.  Moore Decl.¶ 4.

Between August and December 2007, Trainor met several times with representatives of Haley Pontiac, including other company managers and more than 20 Haley Pontiac automobile mechanics.  Moore Decl. ¶ 6.  During those meetings, Trainor represented to Moore and others that he was employed by Toolchex.  Moore Decl. ¶ 7.  In October 2007, Moore informed Trainor that Haley Pontiac intended to contract with Toolchex to administer a TOOLCHEX Tool Reimbursement Plan.  Moore Decl. ¶ 5.  On December 8, 2007, Trainor forwarded copies of the Toolchex Client Agreement and other documents to Haley Pontiac for execution, and with Moore's approval, Haley Pontiac executed a document that it believed was a contract between Haley Pontiac and Toolchex.  Moore Decl. ¶¶ 8-9 & Ex. A.

At no time, however, did Trainor forward to Toolchex any enrollment documents relating to Haley Pontiac.  Leavitt Decl. ¶ 27.  Consequently, Toolchex has never executed any contracts with Haley Pontiac.  Leavitt Decl. ¶ 28.  Indeed, until it discovered Trainor's scam, Toolchex was unaware that Moore and others at the dealership believed that Haley Pontiac had contracted with Toolchex to administer a TOOLCHEX Tool Reimbursement Plan.  *Id*.

### 3. *Toolchex Terminated National Sales Pros and Trainor.*

Toolchex terminated its contract with National Sales Pros effective December 31, 2007. Leavitt Decl. ¶ 23.  As a result, Trainor's relationship with Toolchex was also terminated on December 31, 2007.  Leavitt Decl. ¶ 24.  Toolchex did not hire Trainor as an employee or contractor at the time that it terminated its contract with National Sales Pros, or at any time

7

thereafter. Leavitt Decl. ¶ 25. As a result of his termination, Trainor is not authorized to conduct any business on behalf of Toolchex after December 31, 2007. Leavitt Decl. ¶ 26.

### 4.     *Trainor Scams Haley Pontiac Using the TOOLCHEX Marks.*

The termination of Trainor's relationship with Toolchex, however, did not stop Trainor from seeking to profit personally from Toolchex's name and goodwill. Indeed, after December 31, 2007, Trainor never told Moore or anyone else at Haley Pontiac that he was no longer authorized to conduct business on Toolchex's behalf. Moore Decl. ¶ 10. But acting on his own behalf and without authority from Toolchex, Trainor undertook to operate and collect the profits from a "tool reimbursement plan" for Haley Pontiac by infringing on the TOOLCHEX Marks and giving the false impression that Toolchex stood behind his business venture.

To make his scam work, Trainor had to persuade Haley Pontiac that Toolchex remained in charge of the Plan and prevent Toolchex from discovering the deception. First, Trainor convinced Haley Pontiac that it needed to deal with him directly, and not with Toolchex's corporate offices in Utah. For example, in February 2008, Trainor falsely told Moore that Toolchex would charge Haley Pontiac a fee for shipping its employees' reimbursement checks to Toolchex's headquarters in Utah. Moore Decl. ¶¶ 12-13. Trainor told Moore that Haley Pontiac could avoid such "fees" if Trainor personally collected the checks from the dealership and then personally delivered the employees' reimbursement checks after Toolchex processed them. Moore Decl. ¶ 15. Haley Pontiac agreed to Trainor's suggested arrangement. Moore Decl. ¶ 16.

Second, Trainor had to create counterfeit "Toolchex" documents. For example, on March 15, 2008, Trainor presented Haley Pontiac with a document that purported to be a "Toolchex Invoice" in the amount of $5,357.00. Moore Decl. ¶ 18. Trainor also presented Haley Pontiac with 22 "reimbursement" checks payable to various Haley Pontiac employees.

Moore Decl. ¶ 19.  As with the invoice, these checks were purportedly issued by Toolchex and bore the Toolchex name.  Moore Decl. ¶ 20.  Based on his dealings with Trainor, Moore believed that Toolchex had properly substantiated Haley Pontiac's employees' claimed reimbursement amounts and that Toolchex had verified that the claimed expenses were connected with Haley Pontiac's business.  Moore Decl. ¶ 17.  Toolchex, however, never received any payments from or on behalf of Haley Pontiac.  Leavitt Decl. ¶ 31.

On April 1, 2008, Trainor issued a second "Toolchex Invoice" to Haley Pontiac, requesting yet another check for $5,357.  Moore Decl. ¶ 21 & Ex. B.  Like the previous counterfeit "Toolchex Invoice," the April 1, 2008 invoice was not issued by Toolchex and contained Toolchex's former business address in Utah, as well as an unknown telephone number with a Richmond, Virginia area code.  Leavitt Decl. ¶ 29 & Ex. C.  As with the prior counterfeit invoice, it also instructed Haley Pontiac to make the check payable to "Tool Reimbursement Plan."  Moore Decl. Ex. B; Leavitt Decl. Ex. C.  Genuine Toolchex invoices, however, always instruct clients to make their checks payable to "Toolchex," not "Tool Reimbursement Plan." Leavitt Decl. ¶ 30.  As before, Trainor presented Haley Pontiac with 22 reimbursement checks payable to its employees that purported to be issued by Toolchex and bore the Toolchex name.  Moore Decl. ¶ 22 & Ex. B.  Again, based on his dealings with Trainor, Moore believed that Toolchex had properly substantiated Haley Pontiac's employees' claimed reimbursement amounts and verified the claimed expenses.  Moore Decl. ¶ 17.  Again, however, Toolchex never received any payments from or on behalf of Haley Pontiac.  Leavitt Decl. ¶ 31.

On April 2, 2008, Trainor met with Moore and told him that he was an employee of Toolchex and acting on Toolchex's behalf, that he was authorized to market TOOLCHEX Tool Reimbursement Plans in seven states, that he intended to use—and indeed had used—Haley

9

Pontiac as a reference for other employers that were considering adopting a TOOLCHEX Tool Reimbursement Plan, and that the TOOLCHEX Tool Reimbursement Plan that he was marketing had been approved by Toolchex's in-house and outside counsel. Moore Decl. ¶ 23.

Moore subsequently enquired into Trainor's representations and learned not only that Trainor does not represent Toolchex, but also that Toolchex has no contract with Haley Pontiac. Moore Decl. ¶ 24; Leavitt Decl. ¶ 28. This lawsuit and motion for a preliminary injunction by Toolchex against Trainor followed.

### III. ARGUMENT

When determining whether to grant a preliminary injunction, the Fourth Circuit applies a "hardship balancing test." *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991) (citing *Blackwelder Furniture Co. v. Seilig Manuf. Co.*, 550 F.2d 189 (4th Cir. 1977)). Under the familiar *Blackwelder* test, this Court must consider: (1) the likelihood of harm to Toolchex if the preliminary injunction is denied; (2) the likelihood of harm to Trainor if the preliminary injunction is granted; (3) the likelihood that Toolchex will succeed on the merits; and (4) the public interest. 550 F.2d at 193.

Where the balancing of the harms under the first two factors decidedly favors the plaintiff, the plaintiff need only raise serious questions going to the merits of its claims because there is a lower threshold for a likelihood of success on the merits. *Id.* at 195; *James A. Merritt & Sons v. Marsh*, 791 F.2d 328, 330 (4th Cir. 1986). Similarly, "[i]f [a plaintiff's] likelihood of success is great, the need for showing the probability of irreparable harm is less." *Dan River, Inc. v. Icahn*, 701 F.2d 278, 283 (4th Cir. 1983). Here, Toolchex is able to make a strong showing on both the balancing of harms and the likelihood of success on the merits.

10

As detailed below, Toolchex is likely to succeed on its claims. Further, the irreparable harm to Toolchex and the public from Trainor's infringement of Toolchex's established trademarks and reputation is manifest. A preliminary injunction is necessary and fully justified to prevent Trainor from taking Toolchex's intellectual property for his use and to protect the public's fundamental right to be free from confusion.

**A. Toolchex Will Suffer Continued Irreparable Harm Without an Injunction.**

The Fourth Circuit recognizes that trademark infringement gives rise to irreparable injury because the plaintiff has lost control of its business reputation and there is an inherent injury to the good will and reputation of the plaintiff. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 939 (4th Cir. 1995). Accordingly, as the Fourth Circuit stated, "irreparable injury regularly follows from trademark infringement." *Lone Star*, 43 F.3d at 939.

Quite apart from legal presumptions, the irreparable harm suffered by Toolchex in this case is palpable and direct. Trademark infringement irreparably harms the trademark owner's goodwill and business reputation because of the public's association of its mark with non-identical goods or services. As the Fourth Circuit has recognized, "trademark infringement primarily represents injury to reputation." *Lone Star*, 43 F.3d at 939. Here, Toolchex is the victim of a former sales representative who is fraudulently holding himself out as a Toolchex employee and depriving Toolchex of control over the reputation of its business, the TOOLCHEX Marks, and the quality of services that bear the Toolchex name.

Courts consistently find that injury to reputation or goodwill is not easily measured in monetary terms and, thus, is deemed irreparable. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates the possibility of . . . the loss of goodwill, the

11

irreparable injury prong is satisfied."); *see also S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.").

The confusion created by Trainor's misuse of the TOOLCHEX Marks and Toolchex name establishes clearly that the public has been, and will continue to be, deceived into believing that Toolchex endorses and approves of Trainor's activities. Here *actual* confusion arose from Trainor misleading Haley Pontiac into believing that, by dealing with Trainor, it actually was dealing with Toolchex. Such confusion constitutes irreparable injury to Toolchex. When a consumer chooses to enroll in or provide money to an employee benefit plan based on Trainor's misuse of the TOOLCHEX Marks—and is falsely led to understand that Trainor is, in fact, affiliated with Toolchex—Toolchex is harmed by that consumer's confusion. This consumer confusion is precisely the type of harm that the Lanham Act, 15 U.S.C. §§ 1501 *et seq.*, and its injunctive remedies are designed to cure.

  **B.**  **The Balance of Hardships Favors Toolchex.**

Against the irreparable harm that Toolchex will continue to suffer if an injunction is not issued, any harm that Trainor alleges he will suffer must be given little weight. The only "harm" that will come to Trainor if an injunction is issued will be that he will be precluded from further illegal and damaging infringement of the TOOLCHEX Marks. *See Helene Curtis Indus. v. Church & Dwight Co.*, 560 F.2d 1325, 1333-34 (7th Cir. 1977) (finding that the hardship of requiring one who willfully infringes on another's mark to cease that infringement "merit[s] little equitable consideration"); *KFC Corp. v. Goldey*, 714 F. Supp. 264, 267 (W.D. Ky. 1989) ("[C]ourts have usually held that where the plaintiff is an authorized trademark holder and the defendant is improperly using the trademark, then the threatened harm to the trademark owner

outweighs the threatened harm to the defendant."). Here, the only consequence to Trainor upon the Court's issuance of a preliminary injunction is that Trainor would no longer be able to fraudulently sell or operate employee benefit plans as though they were sponsored by Toolchex, using Toolchex's valuable Marks and purporting to be based on Toolchex's business system. But any harm that Trainor might suffer is of his own making as Trainor has no right under the law to continue to deceive the public by operating under the TOOLCHEX Marks.

### C. There is More than a Substantial Likelihood that Toolchex will Prevail on the Merits of its Claims.

The Fourth Circuit teaches that a district court is entitled to presume a likelihood of success on the merits and irreparable harm when the plaintiff makes a prima facie showing of infringement. *See Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 690 (4th Cir. 1992); *see also Great Eastern Resort Corp. v. Virtual Resort Solutions LLC*, 189 F. Supp. 2d 469, 474 (W.D. Va. 2002). The rationale for such a presumption is the obvious impropriety resulting from evidence of infringement, as the facts of this case make abundantly clear.

The Lanham Act is the primary source of trademark protection for owners of a federally-registered Mark.[3] The Lanham Act provides for injunctive relief for a trademark owner who, *inter alia*, demonstrates that defendant's use of his mark is "likely to create confusion" concerning the origin of goods and services represented by the mark. *Opticians Ass'n of America v. Indep. Opticians of America*, 920 F.2d 187, 194 (3d Cir. 1990); *see also Lyons*

---

[3] In its Complaint, Toolchex also raises claims for trademark infringement and unfair competition under Virginia law. Because the tests for trademark infringement and unfair competition under federal law and Virginia law are essentially the same, with all addressing likelihood of confusion, a finding that Toolchex is likely to succeed on the merits of its claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), also establishes that Toolchex is likely to succeed on its common-law claims. *Lone Star*, 43 F.3d at 930 n.10; *Sweetwater Brewing Co. v. Great Am. Rests., Inc.*, 266 F. Supp. 2d 457, 460-61 (E.D. Va. 2003).

*Partnership, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001). This is due, in part, to the fact that "[f]ew harms are more corrosive in the marketplace than the inability of a trademark holder to control the quality of bogus articles thought (erroneously) to derive from it." *Hypertherm, Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 700 (1st Cir. 1987).

To prevail on a trademark infringement claim, a registrant must show that "it has a valid, protectable trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star*, 43 F.3d at 930; *see also Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984) (registrant entitled to relief where there is a "likelihood" of confusion). Toolchex easily meets this burden. Here, Trainor's substitution and passing off of Toolchex's name and protected Marks are illegal and violate Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1). Moreover, under these facts, there is compelling evidence that Trainor's use of the TOOLCHEX Marks is likely to confuse the public.

## 1. *The TOOLCHEX Marks are Valid and Protectable.*

To demonstrate a valid and protectable trademark under Section 32 of the Lanham Act, the plaintiff must show conclusive evidence of (1) the validity of the registered mark; (2) the registration and ownership of the mark; and (3) the registrant's exclusive right to use the mark in commerce. *See* 15 U.S.C. § 1114(1); *Lone Star*, 43 F.3d at 930. Here, there is conclusive evidence of all three elements showing that Toolchex has a valid and protectable trademark under the Lanham Act.

First, Toolchex has presented compelling evidence of the validity of its registered Marks because Toolchex has used the TOOLCHEX Marks on advertising and documents related to its products "in such a manner that its nature and function are readily apparent and recognizable without extended analysis or research and certainly without legal opinion." *MicroStrategy Inc. v.*

14

*Motorola, Inc.* 245 F.3d 335, 342 (4th Cir. 2001). As demonstrated above, Toolchex uses the TOOLCHEX Mark and the TOOLCHEX Plus Design Mark on its advertising and forms related to its Tool Reimbursement Plans, making their origin and ownership unambiguous. *See Sweetwater Brewing Co., LLC v. Great Am. Rests., Inc.*, 266 F. Supp. 2d 457, 461 (E.D. Va. 2003). Second, Toolchex has produced evidence of the validity of its registered marks based on the PTO's award of the TOOLCHEX Marks on July 29, 2003 (Reg. No. 2,742,122), and January 13, 2004 (Reg. No. 2,829,886), based on Toolchex's application filed on October 2, 2002. *See Sweetwater*, 266 F. Supp. 2d at 461. Finally, Toolchex has proffered evidence of its exclusive right to use the TOOLCHEX Marks in commerce because it received certification of registration from the PTO for the Marks. *See id.* Accordingly, Toolchex has demonstrated that it has protectable marks under the Lanham Act. *See id.* at 461-62.

### 2. *Trainor's Use of the TOOLCHEX Marks has Created Actual Confusion, Not Merely the Likelihood of Confusion.*

When determining whether a likelihood of confusion exists, this Court considers a number of factors including the strength or distinctiveness of plaintiff's mark, the similarity of the marks, the similarity of the goods the marks identify, the similarity of the facilities the parties use in their businesses, the similarity of the advertising the two parties use, the defendant's intent, actual confusion, the quality of the defendant's product, and the sophistication of the consuming public. *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463-64 (4th Cir. 1996). Not all factors carry equal relevance, and not all factors apply in each case. *Pizzeria Uno*, 747 F.2d at 1527.

Here, there is compelling evidence that Trainor subjectively and knowingly *intended* to confuse customers like Haley Pontiac by passing off—and operating—a fake employee benefit plan as though it were a genuine Toolchex Plan. Indeed, the marks used by Trainor are identical

15

to the protected TOOLCHEX Marks and are used in the same way that they are used by Toolchex on forms used in the administration of tool reimbursement plans; Trainor merely changed the address and phone numbers. "Where, as here, one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion." *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987) (citing *AMP, Inc. v. Foy*, 540 F.2d 1181, 1186 (4th Cir. 1976)). *See, e.g.*, *Thompson v. Haynes*, 305 F.3d 1369, 1375 (Fed. Cir. 2002) (former distributor of trademarked product illegally made its own substitute products, labeled them with the protected trademark, and sold them to customers who had ordered genuine products).

Moreover, although evidence of actual confusion is not required to establish a likelihood of confusion, where, as here, such evidence exists, it "is entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion." *Lone Star*, 43 F.3d at 937. "In fact, when the plaintiff's mark is strong and defendant's use of a similar mark has caused actual confusion, the inquiry ends almost as soon as it begins." *Sweetwater*, 266 F. Supp. 2d at 462 (citing *Sara Lee*, 81 F.3d at 467). Trainor has caused actual confusion by using the Toolchex name and the TOOLCHEX Marks, leading Haley Pontiac to pay Trainor for what it thought was a genuine TOOLCHEX Tool Reimbursement Plan because Trainor told the dealership that his activities were authorized by Toolchex and that he was operating a genuine TOOLCHEX Tool Reimbursement Plan. *See* Moore Decl. ¶¶ 9, 17, 23. "It is well established that 'falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source of sponsorship constitutes infringement.'" *Playboy Enterprises, Inc. v. Frena*, 839 F. Supp. 1552, 1561 (M.D. Fla. 1993) (quoting *Burger King v. Mason,* 710 F.2d 1480, 1492 (11th Cir.1983)). Thus, not only is Trainor's use of the identical Mark *likely* to cause

confusion, it has *already* caused *actual* confusion. The presence of actual confusion is the strongest indicator that future confusion is likely. *See Lone Star*, 43 F.3d at 937.

### D. A Preliminary Injunction is in the Public Interest.

The last factor to be considered under *Blackwelder* is whether issuing the preliminary injunction is in the public interest. "The purpose of trademark protection is to protect the public from confusion." *AMP Inc. v. Howard J. Foy, Jr.*, 540 F.2d 1181, 1186 (4th Cir. 1976). This policy is of paramount importance. *Lone Star*, 43 F.3d at 939. Thus, once a likelihood of confusion has been shown, harm to the public interest is presumed. *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 218 (1st Cir. 1989).

Here, moreover, the injury to the public is manifest. Trainor has promoted himself to the public as though he were an employee of Toolchex authorized to provide TOOLCHEX Tool Reimbursement Plan services, when the reality is that Defendant has no relationship with Toolchex and has no authority to provide TOOLCHEX Tool Reimbursement Plan services. Unless Trainor is enjoined from continuing to infringe Toolchex's intellectual property rights, the public will continue to be confused and misled by his conduct, all to the detriment of the goodwill and reputation represented by the TOOLCHEX Marks. "Public policy strongly favors allowing the courts to 'fashion remedies which will take all the economic incentive out of trademark infringement.'" *Scan Design of Florida v. Scan Design Furniture, Inc.*, No. 01CV6695, 2001 WL 599146, at *7 (S.D. Fla. May 18, 2001) (quoting *Playboy Enterprises v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982)). Given the importance of these public interests, the Court should resolve any doubts in favor of granting preliminary relief. *Nailtiques Cosmetic Corp. v. Salon Sciences, Corp.*, No. 96-2709-CIV, 1997 WL 244746, at *5 (S.D. Fla. Jan. 10, 1997).

### E. The Relief Sought in Toolchex's Motion is Appropriate.

Toolchex seeks an Order from this Court that (1) enjoins Trainor from using the TOOLCHEX Marks or any colorable imitation thereof that is likely to cause consumer confusion with any trademarks owned by the Plaintiff; (2) ordering Trainor to file with this Court and to serve upon Plaintiff within seven business days after service upon Defendant of this Court's preliminary injunction order, a written statement by Trainor, signed under oath, setting forth in detail the manner in which Trainor has complied with the preliminary injunction; and (3) directing Toolchex to file an undertaking as security for costs in accordance with Federal Rule of Civil Procedure 65(c).[4]

Toolchex is entitled to this relief because Toolchex properly terminated its relationship with Trainor, and despite termination, Trainor has fraudulently operated a prohibited competitive business using Toolchex's name and federally-registered protected trademarks. Such actions unfairly appropriate and damage Toolchex's legitimate business interests in both the services it provides and its goodwill, thereby causing Toolchex to suffer irreparable harm and entitling it to injunctive relief. Under the circumstances here, the relief sought by Plaintiff in this motion for a preliminary injunction is the minimum necessary to stop Defendant's infringing activities, avoid confusion, and protect the public interest.

---

[4] The Court may allow an undertaking in lieu of a bond. *See* Fed. R. Civ. P. 65.1. The Court has discretion to set the amount in such sum as it deems proper. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). Where, as here, the risk of harm to the enjoined Defendant is remote, the Court may fix the amount accordingly, including requiring a nominal amount or an amount of zero. *See id.* at 421 & n.3.

## IV.   CONCLUSION

For the reasons stated herein, Plaintiff Toolchex, Inc. respectfully requests that the Court grant its Motion for a Preliminary Injunction.

Respectfully submitted,

TOOLCHEX, INC.

By Counsel

Dated: April 22, 2008

OF COUNSEL:
Miriam L. Fisher
Brian C. McManus
Mark J. Sherer
MORGAN, LEWIS, & BOCKIUS LLP
1111 Pennsylvania Avenue
Washington, DC  20004
Telephone:  202.739.3000
Facsimile:   202.739.3001

　　　　　/s/
Thomas J. O'Brien (VSB # 23628)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania, Avenue NW
Washington, DC 20004
Telephone: 202.739.3000
Facsimile:  202.739.3001
Email:  to'brien@morganlewis.com

*Attorneys for Toolchex, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of April, 2008, I caused a true copy of the foregoing Memorandum of Law in Support of Plaintiff Toolchex, Inc.'s Motion for a Preliminary Injunction, and the accompanying declarations and exhibits, to be served by U.S. Mail, postage prepaid, and to be delivered to a process server with instructions promptly to serve it personally upon:

Patrick J. Trainor
[Street address redacted per Local Rule 7(C)(1)]
Chester, VA 23831

*Defendant*

                                        /s/
                                Thomas J. O'Brien (VSB # 23628)
                                MORGAN, LEWIS & BOCKIUS LLP
                                1111 Pennsylvania, Avenue NW
                                Washington, DC 20004
                                Telephone: 202.739.3000
                                Facsimile:  202.739.3001
                                Email:  to'brien@morganlewis.com

                                *Attorneys for Toolchex, Inc.*